**UNITED CARBON COMPANY, Appellant,**

**v.**

**Faye RAMSEY et al., Appellants.**

Court of Appeals of Kentucky.

June 9, 1961.

Rehearing Denied Nov. 22, 1961.

O. T. Hinton, Pikeville, for appellant.

James Ramsey, Pikeville, for appellee.

PALMORE, Judge.

The appellant, United Carbon Company, which we shall call "the company," has an oil and gas leasehold, created in 1925; on which there are several producing gas wells. In 1934 the company by written agreement granted to the appellee Mrs. George (Faye) Ramsey "the right to take gas free for domestic use for light and heat inside of one dwelling house occupied by her from the gas well known as B. & J. Weddington No. 4, * * * such right to be exercised by said Mrs. George Ramsey at her own expense and risk and subject to the use, operation, pumping and right of abandonment of the said well by the said lessee," etc. In this suit the company sought an injunction to prevent Mrs. Ramsey and her husband from interfering with its proposed installation of a meter and low pressure regulator on the Ramseys' gas line at or near the well. The appeal is from a judgment denying relief.

The well is located on the property of Mrs. Thompson, a sister of Mrs. Ramsey, and for a number of years the Ramseys exercised their free gas right by connecting with a line running to the Thompson house. In March of 1959 the company requested Mrs. Ramsey to install a line directly connecting her premises with the well (a distance of 1,500 feet), which she did. In the same letter the company advised her that pursuant to a new policy designed to prevent waste by eliminating high pressure in private lines it proposed to install at the well a new spring type regulator and a meter. Previously it had been customary for low pressure regulators (reducing the pressure from pounds to ounces) on private lines to be located at or near the points of consumption rather than at the well.

After they had received the letter from the company and had laid a new line from the well to their home the Ramseys installed two new meters of their own at or near the house, one of which reduces the pressure to something between 15 and 50 pounds and the other of which further reduces it to ounces for safe use in the house. Then, when company representatives visited the' Ramseys to discuss moving the regulator to the well they were advised to the effect

that they would have to go to court. In fact, the evidence is rather convincing that Mr. Ramsey threatened violence in the event the company should attempt to put a regulator on his line at the well. This suit followed.

The company's chief witness testified that the location of low pressure regulators close to the well is desirable because in the event of leaks in the private line less gas would be lost than would be lost if a high pressure were being maintained in the line. Meters, he said, are desirable in order that the company may know how much gas the well is producing and are also helpful in the detection of leaks. The letter to the Ramseys cited KRS 353.160(1), which provides that natural gas shall not be permitted to escape from any well or pipe line when it is reasonably possible to prevent such waste.

■ According to the evidence in the case the only tangible disadvantage to the Ramseys from the location of a low pressure regulator at the well appears to be that sometimes in cold weather moisture may collect on it and freeze. This might require Mr. Ramsey to travel 1,500 feet to correct the trouble. However, there are various means of prevention, such as building a protective covering for the regulator, and we are not impressed with gravity of this objection. Nor do we find it particularly relevant that for 25 years the company acquiesced in the system under which the regulator was located at or near the house. So long as the company provides at the well a sufficient supply of gas for Mrs. Ramsey's domestic uses it is fulfilling its contract. She is not entitled to any more pressure beyond that point than is necessary in order to force from the other end of her line, assuming it is serviceable, enough gas to serve her domestic requirements for light and heat inside one dwelling house. The contract is not ambiguous in this respect, and we see no real question on the merits. Should the company fail to provide

a regular and sufficient supply for the purposes specified in the contract the Ramseys have ample remedy.

■ Appellees invoke the rule that an injunction will not lie in the absence of irreparable damage. So it is, but an injury is regarded as irreparable if "there exists no certain pecuniary standard for the measurement of the damages." 43 C.J.S. Injunctions § 23, p. 447; 28 Am.Jur. 533–534 (Injunctions, § 48). Should the Ramseys succeed in obstructing the company's exercise of its rights in this case it is obvious that there could be no fair and reasonable redress. Injunction was the only remedy available to the company without subjecting its employes to the risk of violence. It is no defense to say that there is no proof that the Ramseys had wasted or were wasting gas, hence there is no injury to the company; the freedom to operate its affairs in a lawful and businesslike manner is none the less a valuable right merely because it is intangible, and to the extent it is restricted there is an injury.

■ For the same reason just cited the company had an appeal in this case as a matter of right under KRS 21.060. The amount in controversy is not translatable in terms of money. McLean v. Thurman, Ky. 1954, 273 S.W.2d 825, 827; Salyers v. Tackett, Ky.1958, 322 S.W.2d 707, 709. Hargis v. Dumbacher, Ky.1956, 293 S.W.2d 637, cited by appellees in support of their motion to dismiss, was a simple passway case in which the amount in controversy was ascertainable by establishing the difference between the market value of the appellant's property with the easement and its market value without it. Cf. Rogers v. Flick, 1911, 144 Ky. 844, 139 S.W. 1098, 1100.

Immediately at the conclusion of testimony in this case on May 4, 1959, the court indicated that counsel for appellees should draw a judgment dismissing the complaint. Judgment was drawn accord-

ingly and on May 5, 1959, was endorsed "Have seen" and initialed by counsel for appellant. It was signed by the judge and entered on May 7, 1959. Sixty days later, on July 6, 1959, counsel for appellant filed a verified motion for extension of time until that day in which to file a notice of appeal, showing as the basis for excusable neglect that because of illness he did not learn of the entry of the judgment until after the 30-day filing period specified by Cr 73.02. Counsel for appellees responded by counter-affidavit showing the facts with respect to opposing counsel's initialing of the proposed judgment and receiving copies thereof on May 5, 1959. The motion was sustained and the notice was filed immediately on July 6, 1959, that being the last permissible day of extension under CR 73.02.

■■ Appellees' motion to dismiss the appeal on the ground that the notice of appeal was not timely filed was passed for consideration with the merits. Having now considered it, we conclude that the extension of time to and including July 6, the sixtieth day following the date the judgment was entered, was within the discretion of the trial court. A motion for such an extension may be made, upon notice, after the expiration of the original 30-day period so long as it is in time to allow the notice of appeal to be filed within 30 days from such expiration. 7 Moore's Federal Practice R73, par. 73.09 [3], pp. 3138–3141; 3A Barron & Holtzoff § 1553, pp. 66–67. See also North Umberland Mining Co. v. Standard Acc. Ins. Co., 9 Cir., 1952, 193 F.2d 951. Though the circumstances shown by the record leave a healthy doubt as to whether counsel's neglect was in fact excusable, the authority of a trial court in discretionary matters is necessarily broad. We cannot say it was abused in this case.

Judgment reversed and cause remanded for entry of a judgment granting permanent injunction as demanded in the complaint.